Filed 3/30/20 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D076200 |
| Plaintiff and Respondent, | (Super. Ct. Nos. FSB17002568, FSB17002569) |
| v. | |
| IAN ALEXANDER HENDERSON et al., | ORDER DENYING REHEARING AND MODIFYING OPINION |
| Defendants and Appellants. | [NO CHANGE IN JUDGMENT] |

THE COURT:

The petition for rehearing is denied.

It is ordered that the opinion filed herein on March 13, 2020, be modified as follows:

On page 24, the name "Hernandez" is removed from the second full paragraph and replaced with the name "Henderson" so that the paragraph now reads:

Because we are vacating Henderson's sentence and remanding for further sentencing proceedings, we need not decide whether the trial court abused or was within its broad discretion in imposing a concurrent prison term on count 2. (*People v. Clancey* (2013) 56 Cal.4th 562, 579 [court has broad discretion to decide whether to run prison terms on multiple offenses concurrently or consecutively].) On remand, the trial court must resentence Henderson after deciding whether to exercise its discretion to strike his five-year prior serious felony enhancement (see part VI, *post*). If the court elects consecutive sentences it must state reasons for its decision. (*People v. Sperling* (2017) 12 Cal.App.5th

1094, 1103 ["A trial court is required to state its reasons for imposing consecutive sentences"]; see Cal. Rules of Court, rule 4.406(b)(5).) And while "[o]nly one criterion or factor in aggravation is necessary to support a consecutive sentence" (*People v. Davis* (1995) 10 Cal.4th 463, 552; see *People v. King* (2010) 183 Cal.App.4th 1281, 1323), the trial court is precluded from using the same facts to impose a consecutive sentence and otherwise enhance Henderson's prison sentence. (See Cal. Rules of Court, rule 4.425(b)(1).)

On page 36, the name "Hernandez" is removed from the disposition and replaced

with the name "Henderson" so that the disposition now reads:

"The sentences of Henderson and Marks are vacated and the matters remanded with directions that the trial court resentence both defendants and in doing so determine (1) whether to impose a consecutive or concurrent sentence for Henderson's count 2 conviction; and (2) whether to strike Henderson's and Marks's five-year enhancement under Penal Code sections 667, subdivision (a)(1) and 1385. In all other respects the judgments are affirmed."

There is no change in the judgment.

BENKE, Acting P. J.

Copies to: All parties

2

Filed 3/13/20 (unmodified version)

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>   v.<br><br>IAN ALEXANDER HENDERSON et al.,<br><br>   Defendants and Appellants. | D076200<br><br><br><br>(Super. Ct. Nos.<br>  FSB17002568, FSB17002569) |

APPEALS from judgments of the Superior Court of San Bernardino, Michael A. Knish, Judge. Judgments of conviction affirmed; sentences vacated and remanded with directions.

Jason L. Jones, under appointment by the Court of Appeal, for Defendant and Appellant Ian Henderson.

Ellen M. Matsumoto, under appointment by the Court of Appeal, for Defendant and Appellant Zavier Marks.

Xavier Becerra, Attorney General, Gerald A. Engler and Julie L. Garland, Assistant Attorneys General, Charles C. Ragland, Scott C. Taylor and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Ian Alexander Henderson and codefendant Zavier Michael Marks of attempted murder (Pen. Code,[1] §§ 664, subd. (a), 187, subd. (a); count 1) and shooting at an inhabited dwelling (§ 246; count 2). With respect to count 1, the jury found true allegations that the attempted murder was committed by both defendants willfully and with deliberation and premeditation (§ 664, subd. (a)). It found not true allegations as to both counts that the defendants committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)). The court dismissed allegations that as to both counts, a principal either used a firearm, discharged a firearm, or discharged a firearm causing great bodily injury (§ 12022.53, subds. (b)–(e)). However, it found true allegations that Henderson and Marks each suffered a single conviction constituting both a serious felony prior conviction (§ 667, subd. (a)(1)) and a prior strike conviction (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)).

The court sentenced Henderson to a 29-year-to-life prison sentence: seven years to life on count 1 doubled to 14 years to life by his strike prior, plus a consecutive middle term of five years on count 2 doubled to 10 years, and an additional consecutive five years for the serious felony prior conviction. It sentenced Marks to 19 years to life in prison: seven years to life on count 1 doubled to 14 years to life by the strike prior conviction, plus a concurrent midterm of five years on count 2 doubled to 10 years, and a five-year enhancement for the serious felony prior conviction.

---

[1] Undesignated statutory references are to the Penal Code.

Henderson contends: (1) his count 2 conviction must be reversed because it is barred by section 1387, under which a prosecutor may not refile charges that have already been twice dismissed; (2) the prosecutor committed prejudicial misconduct during his closing argument when explaining premeditation and Henderson received ineffective assistance of counsel by counsel's failure to object to it; and (3) the trial court erred by imposing a consecutive sentence on count 2 based on the same facts as underlying its imposition of a serious felony prior conviction. Marks contends the trial court erred by denying Henderson's motion alleging a prima facie case of discrimination after the prosecutor exercised his first peremptory challenge against an African-American juror (Juror No. 12, also referred to by the parties as J12-8). Marks joins Henderson's first two claims and Henderson joins Marks's claim.

In supplemental briefing, both Henderson and Marks ask that the matter be remanded for resentencing so that the trial court may exercise its discretion whether to impose or strike the five-year sentence for their prior serious felonies. Pointing out the court did not indicate at sentencing whether it would have stricken the five-year terms if it knew it had discretion to do so, the People concede the matter should be remanded so the court can exercise its discretion whether to strike those terms. We agree with the concession. We vacate the defendants' sentences and remand with directions set forth below. With the exception of Henderson's claim concerning imposition of his consecutive sentence on count 2, which we direct the trial court to address on remand, we reject the defendants' other contentions.

FACTUAL AND PROCEDURAL BACKGROUND

Given the nature of defendants' appellate claims it suffices to just briefly summarize the underlying facts of the offenses. We provide additional detail below as necessary to resolve prejudice arguments.

At about 2:15 a.m. on March 26, 2017, three men seen in proximity to a vehicle within an apartment complex asked the victim where he was from and whether he was a "Blood or a Crip." After the victim said he was from Watts, they fired multiple rounds of bullets at him, hitting the victim's hip after he dropped to the ground and tried to crawl away, and also hitting occupied apartments. A security guard called police and gave them the license plate number of the car when it drove out of the complex. An officer found 24 bullet casings in the area.

At about 10:00 that morning an officer stopped the vehicle involved in the shooting, finding Henderson in the driver's seat and Marks, another man, and a woman as passengers. Police searching the vehicle found two loaded nine-millimeter handguns, a large capacity magazine for one of the guns, and a cell phone. An additional search of the car revealed a third loaded handgun, which was later determined by a firearms examiner to have been the gun that fired eight of the rounds at the crime scene. The examiner determined one of the 24 rounds was fired from one of the other two guns found in the car. Federal officers performed an analysis on Henderson's phone and found it had activated three cell phone towers in the San Bernardino area at about 2:17 a.m., about 1.5 miles from the crime scene.

4

Neither Henderson nor Marks presented witnesses in their defense. Their third codefendant, Edwurd Sanders, testified that he, Henderson and Marks drove to a strip club that morning, drank alcohol and left at about 1:45 a.m. The jury could not reach a verdict as to Sanders, and the court declared a mistrial as to him.

DISCUSSION

I. *Operation of Two-Dismissal Rule and Exception of Sections 1387 and 1387.1*

A. *Legal Principles*

Section 1387, subdivision (a) provides, with exceptions not applicable here: "An order terminating an action pursuant to this chapter . . . is a bar to any other prosecution for the same offense if it is a felony . . . and the action has been previously terminated pursuant to this chapter . . . ." This statute sets out a " 'two-dismissal rule; two previous dismissals of charges for the same offense will bar a new felony charge.' " (*People v. Trujeque* (2015) 61 Cal.4th 227, 255; see also *People v. Juarez* (2016) 62 Cal.4th 1164, 1167.)

Section 1387.1, subdivision (a) constitutes an exception to that rule—allowing a third opportunity for the People to pursue violent felony charges—if either of the prior two dismissals was due to excusable neglect and the prosecution did not act in bad faith. (*People v. Trujeque*, *supra*, 61 Cal.4th at pp. 255-256; *People v. Standish* (2006) 38 Cal.4th 858, 882; *People v. Villanueva* (2011) 196 Cal.App.4th 411, 425.) That section provides: "(a) Where an offense is a violent felony, as defined in Section 667.5 and the prosecution has had two prior dismissals, as defined in Section 1387, the people shall be permitted one additional opportunity to refile charges where either of the prior dismissals

5

under Section 1387 were due solely to excusable neglect.  In no case shall the additional refiling of charges provided under this section be permitted where the conduct of the prosecution amounted to bad faith."  Thus, "if the previously charged and dismissed felony is not a violent felony as defined in section 667.5, '[s]ection 1387 generally bars a third prosecution of a felony, and certainly bars further prosecution when section 1387.1's prerequisites are not met [e.g., a section 667.5 violent felony].' "  (*People v. Salcido* (2008) 166 Cal.App.4th 1303, 1310.)

These statutes, contained in Chapter 8 (entitled "Dismissal of the Action for Want of Prosecution or Otherwise") are part of  "a series of statutes, commencing with Penal Code section 1381, [that] are a construction and implementation of the California Constitution's speedy trial guarantee."  (*People v. Villanueva*, *supra*, 196 Cal.App.4th at p. 422.)  That they protect that pretrial right is reflected in their legislative history, which the California Supreme Court has already examined in several cases.  In those, the court addressed the " 'human problems the Legislature sought to address in adopting section 1387—" 'the ostensible objects to be achieved [and] the evils to be remedied.' " ' " (*People v. Juarez*, *supra*, 62 Cal.4th at p. 1170; *People v. Traylor* (2009) 46 Cal.4th 1205, 1213-1214; *Burris v. Superior Court* (2005) 34 Cal.4th 1012, 1018.)  It explained: " 'Section 1387 implements a series of related public policies.  It curtails prosecutorial harassment by placing limits on the number of times charges may be refiled.  [Citations.] The statute also reduces the possibility that prosecutors might use the power to dismiss and refile to forum shop.  [Citations.]  Finally, the statute prevents the evasion of speedy trial rights through the repeated dismissal and refiling of the same charges.' "  (*Juarez*, at

6

p. 1170, quoting *Burris*, at p. 1018.)  This court and others have said that the purpose of section 1387 is to " 'prevent improper successive attempts to prosecute a defendant.' " (*People v. Salcido*, *supra*, 166 Cal.App.4th at p.1309; *Berardi v. Superior Court* (2008) 160 Cal.App.4th 210, 219; *People v. Rodriguez* (2013) 217 Cal.App.4th 326, 334; *People v. Cossio* (1977) 76 Cal.App.3d 369, 372.)

"By providing that a single dismissal of a misdemeanor bars further prosecution for the same offense but requiring two dismissals for felonies, '[s]ection 1387 reflects a legislative judgment that because of the heightened threat to society posed by serious crimes, more filings should be permitted for serious crimes than for minor ones.' [Citation.]  'As further proof of this intent, while two filings are allowed for most felonies, section 1387.1 carves out the most serious category of felonies, violent felonies, and allows a third filing for these crimes under certain circumstances.' "  (*People v. Juarez*, *supra*, 62 Cal.4th at pp. 1170-1171.)  Underlying the statutes is the compelling public interest in prosecuting very serious felonies such that society should not pay the price of procedural errors.  (See Assem. Com. on Public Safety Analysis, Sen. Bill No. 709 (1987-1988 Reg. Sess.) as amended April 22, 1987, p. 2.; Dept. of Justice Bill Analysis, Sen. Bill No. 708 (1987-1988 Reg. Sess.) March 17, 1987, p. 1.)  Thus, the People should be permitted to refile and hold a trial on the merits on such charges despite having had to previously dismiss them due to errors on the part of the court, prosecution, law enforcement agency or witnesses.  (See *People v. Woods* (1993) 12 Cal.App.4th 1139, 1148-1149.)

B. *Background*

Before trial, defense counsel jointly moved to dismiss certain of the defendants' charges on grounds they were twice previously dismissed and barred from further prosecution under section 1387. The trial court conducted an evidentiary hearing on the People's claim that the case fell within the exception to section 1387 set forth in section 1387.1 for violent felonies. It found for purposes of that exception the dismissals were the result of the People's excusable neglect, justifying the People's third filing of all violent felonies under section 1387.1. The prosecutor pointed out the offense for shooting at an inhabited dwelling (§ 246) with the accompanying gang allegation (§ 186.22, subd. (b)) was a life offense, and all life offenses constituted violent felonies. The court agreed, dismissing certain charges but retaining the section 246 charge, which was renumbered in the fifth amended information as count 2.

The case thus proceeded against the defendants on the section 246 offense notwithstanding the two prior dismissals, and the jury returned guilty verdicts on those. However, the jury found not true the allegation under section 186.22, subdivision (b)(1)(C) that defendants committed that offense for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members. As indicated above, the trial court at sentencing imposed a consecutive 10-year sentence on that conviction for Henderson, and a concurrent 10-year sentence for Marks.

C. *Contentions*

Defendants contend that in view of the jury's not true finding on the gang allegation, their convictions for shooting at an inhabited dwelling under section 246 are nonviolent felonies that must be reversed as barred under section 1387's rule as to twice-dismissed felony charges. Though they engage in a fairly lengthy discussion on the point, they ultimately do not dispute that the section 246 charge with accompanying gang allegation qualified as a violent felony under section 667.5, subdivision (c), permitting the prosecutor to refile the charge a third time under 1387.1. (See *People v. Jones* (2009) 47 Cal.4th 566, 576-578 [for purposes of applying section 12022.53, subdivision (c) sentence enhancement a section 246 conviction committed to benefit a street gang is a felony punishable by life imprisonment]; *People v. Florez* (2005) 132 Cal.App.4th 314, 318-319 [holding for purposes of limiting presentence conduct credit, "the felony conviction for discharging a firearm at an inhabited dwelling house in violation of section 246, committed for the benefit of a criminal street gang under section 186.22[, subdivision] (b)(4) qualifies as 'a felony offense listed in subdivision (c) of Section 667.5' "].) However, defendants argue that as in the context of a time-barred lesser included offense that must be dismissed on acquittal of the greater offense (assertedly addressed in *People v. Beasley* (2003) 105 Cal.App.4th 1078), once the jury in this case found the gang allegation not true, the section 246 conviction was "defective" and "facially not permitted" under section 1387 or 1387.1, requiring its dismissal.

Interpreting section 1387.1, the People respond that the jury's later untrue finding on the gang allegation does not warrant overturning defendants' section 246 convictions.

9

They maintain such a result would be inconsistent with the purposes of section 1387, which involve curtailing abuses of prosecutors' power to refile before trial, not events occurring after the jury's verdict. The People argue that even if a crime could be barred by a jury's later not-true finding, in this case defendants forfeited any argument to the contrary by failing to object on that ground after the verdict.

D. *Analysis*

As a threshold matter, we reject the People's forfeiture argument. The underlying facts of defendants' offenses and the dismissals are undisputed, as are the jury's verdicts and not-true findings on the gang allegations. Thus, the interpretation and operation of sections 1387 and 1387.1 in these circumstances is a question of law that we may consider for the first time on appeal. (*People v. Runyan* (2012) 54 Cal.4th 849, 859, fn. 3 [reviewing court "may consider new arguments that present pure questions of law on undisputed facts"]; see *People v. Gonzales* (2018) 6 Cal.5th 44, 49; but see *People v. Jones* (1998) 17 Cal.4th 279, 313 [defendant forfeited claim that section 654 barred second prosecution for offenses by failing to object on that ground in the trial court].)

We nevertheless reject defendants' contentions. Our resolution of the issue on the merits stands and falls on the Legislature's focus and intent behind the operation of sections 1387 and 1387.1. The main goal of statutory interpretation is to effectuate the Legislature's intent. (See *Riverside County Sheriff's Dept. v. Stiglitz* (2014) 60 Cal.4th 624, 630.) Thus, "the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute . . . .

10

Literal construction should not prevail if it is contrary to the legislative intent apparent in the statute. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735; *Riverside County Sheriff's Dept. v. Stiglitz*, at p. 630; *People v. Mullendore* (2014) 230 Cal.App.4th 848, 854.)

Though section 1387 states it bars "any other prosecution for the same [twice-dismissed felony] offense,"[2] the Legislature's intent was to prohibit the *refiling and pursuit* of previously-dismissed *charges*; section 1387 does not address *convictions* once charges are properly brought. (Accord, *People v. Trujeque*, *supra*, 61 Cal.4th at p. 255 [section 1387's two dismissal rule means "two previous dismissals of *charges* for the same offense will bar a new felony *charge*," italics added].) Accounting for that, we cannot hold a court must dismiss a defendant's felony conviction under section 1387 because following the jury's guilty verdict it no longer qualifies as a violent felony. Section 1387.1 authorized the third filing of defendants' count 2 charge which qualified as a violent felony due to the accompanying gang allegation; once the renewed charge was properly refiled, it is of no consequence to defendants' speedy trial rights or any other legislative purpose behind either section 1387 or 1387.1 that the jury rejected the

---

2      Black's Law Dictionary defines "prosecute" as "[t]o commence and carry out (a legal action)." (Black's Law Dict. (11th ed. 2019) p. 1476.) Earlier versions of the legal dictionary have explained that "[t]o 'prosecute' an action is not merely to commence it, but includes following it to an ultimate conclusion." (Black's Law Dict. (6th ed. 1990) p. 1221.) We will not apply the latter meaning, however, when it is contrary to the intent and purpose of the statute. (*Riverside County Sheriff's Dept. v. Stiglitz*, *supra*, 60 Cal.4th at p. 630.)

11

gang allegation, resulting in a nonviolent felony conviction. In that case, notwithstanding the jury's verdict, a defendant's conviction on the base felony offense does not violate section 1387, which merely precludes refiling and "other prosecution" of the same felony.

Defendants cursorily argue that the convictions in this case "should be treated the same as a time-barred lesser included offense conviction." But we see no comparison between the operation of sections 1387 and 1387.1 on the one hand, and the rule that a court must dismiss a jury's lesser included offense conviction barred by its statute of limitations where the pleaded felony is not time-barred. The rules in the latter circumstance are codified in different statutes with different underlying purposes and intentions (in part, the importance of barring stale claims). (See *People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1048, 1050 [applying plain language of sections 799 and 800, which are penalty-based statutes of limitation, and holding "where . . . the jury acquits a defendant of a premeditation finding on an attempted premeditated murder charge and the statute of limitations has run on the attempted murder charge, the attempted murder convictions must be dismissed"].)

## II. *Claim of Prosecutorial Misconduct*

The trial court instructed the jury on premeditation and deliberation for the count 1 attempted murder as follows:

" 'If you find a defendant guilty of attempted murder under Count One, you must then decide whether the People have proved the additional allegation that the attempted murder was done willfully, and with deliberation and premeditation. [¶] . . . [¶] A

12

defendant *deliberated* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill.' . . . 'A defendant acted with *premeditation* if he decided to kill before completing the act of attempted murder. The attempted murder was done willfully and with deliberation and premeditation if either the Defendant or a principal or both of them acted with that state of mind. [¶] The length of time the person spends considering whether to kill does not alone determine whether the attempted killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or . . . ' with[out]3 'careful consideration of the choice and its consequences is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time. [¶] The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved.' " The trial court also instructed the jury: "If you believe that attorneys' comments on the law conflict with my instructions you must follow my instructions."

During closing arguments, the prosecutor argued that the totality of the evidence showed the victim's shooting was not a random act but was planned and coordinated; that the fact the defendants had gloves, loaded guns and extra magazines ready to go and the

---

3    The reporter's transcript appears to have a typographical error here (using "with" instead of "without" as in the written CALCRIM No. 601 instruction), as defendants do not argue the court misread the instruction.

13

fact they fired 24 rounds, hitting the victim who was trying to crawl to safety, made it difficult to say they had no intent to commit murder. He then told the jury:

"And, again, as the judge explained, once you come back guilty on the attempt murder, the next question is premeditation. Right? So the first question you're going to ask after attempt murder is: Was this premeditated? So what does 'premeditation' mean? It means that he took a moment to reflect, and he made a decision; right?

"So the example we commonly give is the yellow light; right? You're driving up on the street. You see a yellow light change. It goes from green to yellow. What do you do? You make a decision; right? You either make, 'Hit the gas,' or, 'You hit the brake.' Now, it's quick, but you are making a decision; right? You are making an active choice—right?—because you had the choice. You might be wrong. Maybe you hit the gas, and it turned red on you. You run the red, and lights and sirens; right? You can make the wrong choice, but you made a choice.

"That's different than someone who, you know, the kids are fighting in the back; they look back, and they just drive right through. It's to make a choice.

"And, obviously, in a firearm case attempt murder can be done with anything; but in a firearm case think about all the steps you have to do to fire a gun. You have to pull it out. You have to point it, and you have to pull the trigger at least once; or in this case, eight and 16 times. Okay?"

Defendants contend the prosecutor's remarks constituted prejudicial misconduct because they misstated the law, specifically by "incorrectly conflat[ing] acting with a specific intent to  kill (basic attempted murder) with premeditation and deliberation."

14

They argue the difference between attempted murder and premeditated attempted murder does not hinge on choosing to act versus accidentally acting; that deliberation hinges on weighing the choice between acting and not. Defendants acknowledge that the Supreme Court upheld a yellow-light analogy in *People v. Avila* (2009) 46 Cal.4th 680, but distinguish that case, claiming the prosecutor here did not describe the possible weighing of considerations that might go into running a yellow light such as distance or road conditions, but focused solely on whether the act was purposeful versus unintentional. They argue "[i]t is reasonably likely the jury understood the prosecutor's analogy about intentionally driving through a yellow light to mean exactly what the prosecutor said it meant: that premeditation and deliberation requires nothing more than making a choice to kill. That if the defendants intentionally shot at [the victim], then premeditation and deliberation was also established."

A. *Legal Principles*

Prosecutors are granted wide latitude during arguments, and are permitted to draw from matters not in evidence that are common knowledge or illustrations drawn from common experience, history or literature. (*People v. Ghobrial* (2018) 5 Cal.5th 250, 289.) A prosecutor will commit misconduct, however, " ' "when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact." [Citation.] . . . "When attacking the prosecutor's remarks to the jury, the defendant must show" that in the context of the whole argument and the instructions there was " 'a reasonable likelihood the jury understood or applied the complained-of

comments in an improper or erroneous manner.' " ' " (*People v. Beck* (2019) 8 Cal.5th 548, 657; see also *People v. Cowan* (2017) 8 Cal.App.5th 1152, 1159.)  In conducting this inquiry, we " ' "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)  The reviewing court must consider the challenged statements in the context of the argument as a whole to make its determination.  (*People v. Cowan*, at p. 1159.)

Though it is improper for a prosecutor to misstate the law (*People v. Cortez* (2016) 63 Cal.4th 101, 130), such misstatements "are generally curable by an admonition from the court." (*People v. Centeno*, *supra*, 60 Cal.4th at p. 674.)  Thus, "[a]s a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People v. Beck*, *supra*, 8 Cal.5th at p. 657; *People v. Ghobrial*, *supra*, 5 Cal.5th at pp. 289-290.)

B. *Defendants Forfeited the Misconduct Claim*

Here, neither Henderson's nor Marks's defense counsel objected to the prosecutor's yellow light remarks on grounds the argument constituted misconduct and/or somehow reduced the People's burden of proof on the issue of premeditation and deliberation.  They did not request an admonition from the court, which under the circumstances would have cured any harm.  Under the above-summarized principles, defendants forfeited the claim. (*People v. Ghobrial*, *supra*, 5 Cal.5th at pp. 289-290; *People v. Tully* (2012) 54 Cal.4th 952, 1037-1038; *People v. Avila*, *supra*, 46 Cal.4th at pp. 710-711.)  We address

16

the arguments in any event to resolve the defendants' accompanying ineffective assistance of counsel claim.

C. *Claim of Ineffective Assistance of Counsel*

" 'In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it "fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms." [Citations.] Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." [Citation.] If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." [Citations.] If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ' " (*People v. Lopez* (2008) 42 Cal.4th 960, 966; see *Strickland v. Washington* (1984) 466 U.S. 668, 690, 694.)

There are at least two reasons why defendants' ineffective assistance claim fails. First, the record does not disclose defense counsels' reasons for remaining silent. There is a plausible tactical reason for their omission; namely counsel could have decided to refrain from objecting to avoid drawing the jury's attention to arguments detrimental to

17

the defense case. (See, e.g., *People v. Harris* (2008) 43 Cal.4th 1269, 1290.) The decision whether to object to an argument is an inherently tactical one that is not ordinarily reviewable on appeal. (*Harris*, at p. 1290; *People v. Frierson* (1991) 53 Cal.3d 730, 749.) And usually, " 'where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1051.) Under these principles no ineffective assistance of counsel appears here.

Second, the argument fails for the absence of a showing of prejudice. (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241 ["If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed"]; *In re Fields* (1990) 51 Cal.3d 1063, 1079.) "A defendant must prove prejudice that is a ' "demonstrable reality," not simply speculation.' " (*People v. Fairbank*, at p. 1241.) Thus, it is not sufficient to show that the alleged errors may have had some conceivable effect on the trial's outcome. Instead, a defendant must demonstrate a "reasonable probability" that the result would have been different were it not for the deficient performance. (*People v. Woodruff* (2018) 5 Cal.5th 697, 761-762.) " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*Ibid.*, quoting *Strickland v. Washington*, *supra*, 466 U.S. at p. 694.)

As to prejudice, defendants argue the prosecutor's argument affected the fundamental guarantee of due process and a fair trial in that it diluted the People's burden of proof by suggesting that if the shooting was intentional, it was necessarily

18

premeditated and deliberate. The contention goes to whether the prosecutor's argument was misconduct by misstating the law on premeditation and deliberation, not whether it is reasonably probable the jury would have reached a different conclusion absent the assertedly improper statements. And, we do not see the prosecutor's challenged assertions as trivializing or impacting the burden of proof, on which the court repeatedly and correctly instructed the jury. Defendants suggest the prosecutor's argument and the reaction to it by defense counsel and the court is akin to what occurred in *People v. Centeno*, *supra*, 60 Cal.4th 659. In *Centeno*, involving a prosecutor's misleading hypothetical using an image of the state of California and repeated use of the word "reasonable," the court held it is error to suggest the prosecution's burden of proof is satisfied if the prosecution's evidence presents a reasonable account. (*Id.* at pp. 670, 672.) The court explained a prosecutor may not argue that deficiencies in the defense evidence can make up for shortcomings in the prosecution's case. (*Id*. at p. 673.) *Centeno* held a prosecutor may not "confound[ ] the concept of rejecting unreasonable inferences with the standard of proof beyond a reasonable doubt" by arguing the jury can find the defendant guilty based on a "reasonable" account of the evidence. (*Ibid.*) The prosecutor's remarks here are nothing like those of the prosecutor in *Centeno*, and as we explain below, the evidence is nowhere near as close as in that case.[4]

---

[4] In *Centeno*, the sole primary witness, the victim, denied her previous story and refused to answer questions, raising serious credibility issues. (*People v. Centeno*, *supra*, 60 Cal.4th at pp. 662-664.) In her closing argument the prosecutor in part argued the jury's decision "has to be based on reason. It has to be a reasonable account" and the

19

Here, as summarized above, the trial court admonished the jury that to the extent an attorney's statements regarding the law conflicted with the court's instructions, then the jury was to follow the court's instructions. It also gave the jury the legal definitions of premeditation and deliberation, instructions that defendants do not challenge. The jury did not express confusion or uncertainty regarding those legal definitions, and absent a showing to the contrary, we presume the jury followed the court's instructions. (*People v. Krebs* (2019) 8 Cal.5th 265, 335.) Nothing from this record rebuts this presumption.

The jury ultimately determined that defendants' attempted murder was premeditated and deliberate. Contrary to Henderson's claim that the evidence on premeditation and deliberation was not overwhelming, we conclude there was abundant trial evidence to support the jury's verdicts and findings. Defendants concede there is "strong" evidence showing they were the individuals in the complex. The record conclusively demonstrated defendants' intent to kill, evidenced by among other things the fact they brought loaded firearms with them to the apartment complex, and after asking the victim where he was from and whether he was a gang member, drew their weapons

law required them to look "at the entire picture, not one piece of evidence, not one witness . . . ." (*Id.* at p. 666.) The prosecutor continued: " 'Is it reasonable to believe that a shy, scared child who can't even name the body parts made up an embarrassing, humiliating sexual abuse, came and testified to this in a room full of strangers or the defendant abused Jane Doe. That is what is reasonable, that he abused her. [¶] Is it reasonable to believe that Jane Doe is lying to set-up the defendant for no reason or is the defendant guilty?' . . . 'Is it reasonable to believe that there is an innocent explanation for a grown man laying [*sic*] on a seven year old? No, that is not reasonable. Is it reasonable to believe that there is an innocent explanation for the defendant taking his penis out of his pants when he's on top of a seven-year-old child? No, that is not reasonable. Is it reasonable to believe that the defendant is being set-up in what is really a very unsophisticated conspiracy led by an officer who has never met the defendant or he['s] good for it? That is what is reasonable. He's good for it.' " (*Ibid.*)

and shot at the victim no less than 24 times as he dropped to the ground and tried to crawl to safety. This evidence overwhelmingly suggests the defendants had ample time to consider and reflect before firing their guns at him while he tried to get away. Defendants point out the jury did not find the gang allegation to be true, suggesting that if the jury did not find a gang motive, it may not have thought defendants entered the apartment complex looking for trouble, but rather based their premeditation finding on evidence the defendants made a rash decision to shoot in an instant. But as the People point out, the jury was instructed that the People were not required to prove motive for any allegation, thus the jurors may not have rejected a gang motive even while finding the allegation untrue. Based on this record, defendants have failed to demonstrate a "reasonable probability" that the result would have been different in count 1 had their trial counsel objected to the prosecutor's challenged statements. (See *People v. Woodruff*, *supra*, 15 Cal.5th at p. 762.) The evidence overwhelmingly demonstrated not only defendants' guilt for attempted murder, but that the attempted murder was premeditated and deliberate. As such, defendants have not shown the required prejudice to establish ineffective assistance of counsel, and this claim fails. (See *Strickland v. Washington*, *supra*, 466 U.S. at p. 687; *People v. Lucas* (1995) 12 Cal.4th 415, 436.)

III.  *Henderson's Challenge to the Count 2 Consecutive Sentence*

At sentencing, the People asked the court to impose a consecutive sentence on Henderson in view of the multiple victims, including children, who were sleeping in their homes when the defendants fired their weapons. Acknowledging it had discretion on that point, the court reviewed the considerations under California Rules of Court, rule 4.425

21

in making its decision whether to sentence Henderson concurrently versus consecutively.[5]

Ultimately, the court adopted the People's position, stating: "Although it is a close decision, the court agrees ultimately with the prosecution. I will make the term on count 2 consecutive to the term on count 1. [¶] The court's reasoning is as follows: And I think a major factor on that is Mr. Henderson's prior conviction of a violent felony involving a firearm, his sentence of 12 years in prison on that case. He was still on parole on that case. He was the one that I think brought the people to the apartment complex. He was the one that had the gang affiliation. And so those factors in the court's mind outweigh the factors that argue for a concurrent sentence. And I also feel those people in

---

[5] "The court: The factors that are suggested in [California Rules of Court, rule 4.425] for the court to consider in concurrent versus consecutive are, (Reading:) [¶] 'Were the crimes or . . .' 'objectives predominantly independent . . . ' So I think that's a no probably. [¶] Were they, (Reading:) [¶] '. . . committed at different times or separate places . . . ' 'or a single period of aberrant behavior.' [¶] Probably a single period of aberrant behavior. [¶] The third factor: Separate acts of violence or threats of violence. I think they were; because, as [the prosecutor] pointed out, there were different [*sic*]. There was the victim of the shooting, and then there were those people in the house sleeping. It's kind of a different or distinct victim. [¶] . . . [¶] And the court has a discretion [*sic*] to consider anything else. I don't think the court is limited. [¶] And I think against Mr. Henderson is the fact that he has a prior violent felony, even though it was not immediate. It was in 2011 or 2009 was the date of the arrest for the robbery, attempted murder that ended up being assault with a firearm. That's certainly something against Mr. Henderson. [¶] Mr. Henderson was the only person in the trial where gang—I think it was the clearest on Mr. Henderson that he was involved with the gang. [¶] In favor of Mr. Henderson is the fact that the jury did not find true the . . . gang enhancement. And, also, that it appeared—although it wasn't clear—that he was the driver. I think—well, he was the driver. I think that was clear. It was fairly clear he may not have been a shooter in the case. So those are things that favor him. [¶] The things that don't favor him are the violent felony, and the fact that he was driving and probably brought them to the place, and that he was the only one that had the gang affiliation, and the fact there were two separate victims."

22

the apartment were seriously victimized by the shooting. [¶] So the court is required . . . to give a statement of reasons, and those are the court's reasons for the consecutive sentence."

When sentencing codefendant Marks, the court elected to run the count 2 sentence concurrently, stating: "Even though it is a very close call, and I think it could go either way, I think, Mr. Marks, I'm going to give you the benefit of the doubt based on—I think a major factor for Mr. Henderson was the 12 years prison sentence on the violent felony that he committed, and Mr. Marks doesn't have that history. So . . . based on that, the court is going to do it concurrently."

Henderson contends the trial court erred by imposing a consecutive sentence on his count 2 conviction while at the same time sentencing codefendant Marks concurrently. Though Henderson acknowledges his counsel did not object at the time, he maintains there was no forfeiture because given the court's recitation of additional factors sufficient to support the consecutive sentence, an objection would not have been appropriate, and it only later became apparent that the court was relying so heavily on his prior felony conviction at Marks's sentencing hearing, at which he and his counsel were not present, giving him no meaningful opportunity to object. Henderson argues the consecutive sentence must be stricken because it is apparent from the court's remarks during codefendant Marks's sentencing hearing that the reason for the sentence was his prior felony and not the other factors, which amounts to an improper dual use of the same fact for the court's imposition of the five-year enhancement under section 667, subdivision (a). According to Henderson, but for the court's reliance on the

23

impermissible prior conviction—the "major factor" in the court's decision—it is reasonably probable he would have been sentenced differently.  The People concede that the trial court erred if it used Henderson's 2011 prior conviction to impose the serious felony prior conviction enhancement and the consecutive sentence on count 2, but they argue the error was harmless because the court considered other factors.

Because we are vacating Hernandez's sentence and remanding for further sentencing proceedings, we need not decide whether the trial court abused or was within its broad discretion in imposing a concurrent prison term on count 2.  (*People v. Clancey* (2013) 56 Cal.4th 562, 579 [court has broad discretion to decide whether to run prison terms on multiple offenses concurrently or consecutively].)  On remand, the trial court must resentence Hernandez after deciding whether to exercise its discretion to strike his five-year prior serious felony enhancement (see part VI, *post*).  If the court elects consecutive sentences it must state reasons for its decision.  (*People v. Sperling* (2017) 12 Cal.App.5th 1094, 1103 ["A trial court is required to state its reasons for imposing consecutive sentences"]; see Cal. Rules of Court, rule 4.406(b)(5).)  And while "[o]nly one criterion or factor in aggravation is necessary to support a consecutive sentence" (*People v. Davis* (1995) 10 Cal.4th 463, 552; see *People v. King* (2010) 183 Cal.App.4th 1281, 1323), the trial court is precluded from using the same facts to impose a consecutive sentence and otherwise enhance Hernandez's prison sentence.  (See Cal. Rules of Court, rule 4.425(b)(1).)

IV.  *Claim of Racially Discriminatory Peremptory Challenge*

24

Defendants contend the trial court erred by denying Henderson's motion in which he asserted the prosecutor exercised his first peremptory challenge against one of two African-American jurors in the jury box in violation of *Batson v. Kentucky* (1986) 476 U.S. 79 and *People v. Wheeler* (1978) 22 Cal.3d 258 (collectively *Batson/Wheeler*). In denying the motion, the trial court found Henderson, who is African-American, had made out a prima facie case of discrimination, but ruled it believed the prosecutor excused the juror for a nondiscriminatory purpose: because the juror complained about an important work conference she had to attend and the prosecutor did not want a distracted or frustrated person serving on the jury.

A. *Background*

Jury selection in defendants' case occurred over the course of several days in early October 2017. Beforehand, the trial court told the prospective jurors the trial schedule would require them to return to court the last two weeks of the month. During questioning, one of the jurors, prospective juror No. 12 in seat 8 (referred to by the parties as J12-8), advised the court and counsel that she had a prepaid work conference to attend later that month, and that if she missed it, her employer, a school district, would be out $500. She later described it as a very important and "legendary" conference.

The following day, in response to the court's questioning, prospective juror No. 12 informed the court that nobody else could go to the conference in her place. After she was placed in the jury box, she answered questions about her background and said she could be a fair juror. She stated that though she had family in law enforcement, she would be open to considering a law enforcement officer witness's credibility. She agreed

25

she could focus on the jury instructions and follow the law.

After the court proceeded to allow peremptory challenges the next day, counsel revisited the issue with prospective juror No. 12 after telling the jurors their job was to figure out the truth, and to look at the total case as a package:

"[Prosecutor]: [Prospective juror No.] 12, are you okay with that? You're quiet this morning, so I'm going to—

"The court: She wants to go to her conference.

"[Prosecutor]: I know. She's like, 'What do I say to get out of here?" Well, should we just talk about that now? [¶] How important is this conference for you?

"[Prospective juror No. 12]: It's very important.

"[Prosecutor]: Okay. And I talked about that positive attitude. I don't want to stick the other 11—I don't think you're a negative person; but if you're bothered by it, or upset by it—

"[Prospective juror No. 12]: Yes.

"[Prosecutor]: —I don't want that either.

"[Prospective juror No. 12]: I have a positive attitude generally. I am bothered by it, only because it was prearranged and prepaid, and I would—I would sit on a trial, which I have June of 2016, but because of that, I am you know, but I'll do what I have to do and what I'm told to do; but I'm just if—if you want honesty, you know, I would like to. And, you know, and everybody's—every attorney has made a comment about it, and it kind of got a little complex, because you asked for the truth, and I—I said I had something pre-arranged. And it's not just going. It's just the idea that it was pre-

26

arranged, prepaid, and it's professional development. And had the trial not involved those dates, that would be different.

"[Prosecutor]: That's fair. [¶] And I think jury duty's never convenient.

"[Prospective juror No. 12]: Right. I—I get that.

"[Prosecutor]: Nobody ever gets the mail and goes, 'Yes'—

"[Prospective juror No. 12]: I know.

"[Prosecutor]: —"finally."

"[Prospective juror No. 12]: Right.

"[Prosecutor]: But I don't think it should be overly onerous. . . . I don't want someone to—you know, I don't want—it's going to bother everybody. It's going to be a distraction for everybody. I don't want it to overly burden anybody. I don't think that's fair.

"[Prospective juror No. 12]: And I did serve in June the first day of my summer break, so—

"[Prosecutor]: You've paid the price. You're saying you already paid a little bit. I got it.

"[Prospective juror No. 12]: So I didn't say, 'Oh, it's my summer break.' I served.

"[Prosecutor]: . . . I understand where you're coming from, and I appreciate it; and it's not to pick on you. It's that—

"[Prospective juror No. 12]: I know.

"[Prosecutor]: —everything else about you says, 'Great juror.' So I hate to lose you, but I—I also don't want this to be a burden.

27

"[Prospective juror No. 12]: All right.

"[Prosecutor]: Okay."

After questioning other prospective jurors, the prosecutor exercised his first peremptory challenge by excusing prospective juror No. 12. The trial court remarked: "Enjoy your conference."

Following the challenge, Henderson's counsel made his *Batson*/*Wheeler* motion, which the other counsel declined to join. He argued Henderson was African-American and thus in a protected class, and it was important that he have people with similar backgrounds on the jury. Counsel argued that because prospective juror No. 12 said she could be fair and apply the law, the only reasonable inference of counsel's challenge was to eliminate a person in the same protected class as Henderson. The prosecutor argued a prima facie case had not been made as there was still an African-American male in the jury box, and there were several African-Americans in the general panel. The court found a prima facie case had been made as "[t]he client of the [objecting] counsel . . . is a member of that class, and . . . it is one of only two that's on the jury."

Asked to explain why he exercised the challenge, the prosecutor said: "I find [prospective juror No.] 12 would have been a very good juror, but she's been mentioning her conference since the first minute we walked in, and she mentioned it at hardships. She's mentioned it multiple times yesterday, and she's mentioned it multiple times today. And I've made a very active point, and I'll continue to make it, which is I don't want jurors who are distracted or in any way frustrated at having to serve at this time because of something going on in their lives. And I think [prospective juror No.] 12 has been

28

very clear and very deliberate about that.  Otherwise, I would have kept her.  She looks like a great juror, but I'm not going to treat her differently than anybody else."

The trial court denied the *Batson/Wheeler* motion:  "I listened carefully to [the prosecutor's] questioning, and there is very strong conviction in my mind that that was the reason that he excused her, the reason that he stated, and it was not for a discriminatory or prohibited purpose."

B.  *Legal Principles*

The California Supreme Court recently set forth the relevant law:  " 'Both the state and federal Constitutions prohibit the use of peremptory challenges to remove prospective jurors based on group bias, such as race or ethnicity.' "  (*People v. Rhoades* (2019) 8 Cal.5th 393, 423, quoting *Batson*, *supra*, 476 U.S. at p. 97; *Wheeler*, *supra*, 22 Cal.3d at pp. 276-277.)  " '[T]here "is a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination." ' "  (*People v. Armstrong* (2019) 6 Cal.5th 735, 766.)

On a *Batson/Wheeler* motion, the following procedures apply:  " ' "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.]  Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes.  [Citations.]  Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial

29

discrimination.' " ' " (*People v. Rhoades*, *supra*, 8 Cal.5th at p. 423; *People v. Smith* (2018) 4 Cal.5th 1134, 1147.)  The defendant throughout retains the ultimate burden of persuasion regarding discriminatory motive.  (*Smith*, at p. 1147.)

Once a defendant satisfies his or her burden to make a prima facie showing of group bias, the adequacy of the prima facie showing becomes moot and the reviewing court skips to the third stage to decide whether the trial court properly credited the prosecutor's reasons for challenging the prospective jurors in question.  (*People v. Smith*, *supra*, 4 Cal.5th at p. 1147.)  At this third stage, the moving defendant must show it was more likely than not that the challenge was improperly motivated.  (*People v. Armstrong*, *supra*, 6 Cal.5th at p. 766; *People v. Woodruff*, *supra*, 5 Cal.5th at p. 753.)  It is the "genuineness of the justification offered, not its objective reasonableness, [that] is decisive." (*Armstrong*, at p. 767.)  " '[T]he "critical question . . . is the persuasiveness of the prosecutor's justification for his peremptory strike." [Citation.]  Usually, "the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible.  Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." [Citation.]  " 'As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province." ' " [Citation.]  Thus, in reviewing a trial court's reasoned determination that a prosecutor's reasons for striking a juror are sincere, we typically defer to the trial court and consider only

30

"whether substantial evidence supports the trial court's conclusions." ' "  (*Smith*, at p. 1147; see *Woodruff*, at p. 753.)

" '[O]ne form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination' is a comparison of the treatment of an excused juror with other similarly situated jurors.  [Citation.]  '[E]vidence of comparative juror analysis must be considered . . . even for the first time on appeal if relied upon by the defendant [if] the record is adequate to permit the urged comparisons.' [Citation.]  But when, as here, a defendant 'wait[s] until appeal to argue comparative juror analysis,' our 'review is necessarily circumscribed,' and we 'need not consider responses by stricken panelists or seated jurors other than those identified by the defendant.' [Citation.]  We review the trial court's ruling on the question of purposeful racial discrimination under a deferential substantial evidence standard, so long as ' "the trial court has made a sincere and reasoned attempt" ' to evaluate each nondiscriminatory justification offered."  (*People v. Smith*, *supra*, 4 Cal.5th at pp. 1147-1148.)

C. *Analysis*

Defendants contend that had the court considered a comparative juror analysis, comparing the People's treatment of prospective juror No. 12 with other similarly situated jurors, it would have concluded the prosecutor's primary motivation behind his peremptory challenge was race-related.  Defendants refer to one other juror, prospective juror No. 1, who they infer was not African-American, and her answers indicating she could be fair and follow the court's instructions, but nevertheless did not want to serve as a juror.  Defendants point out the prosecutor did not excuse prospective juror No. 1 but

31

excused prospective juror No. 12, suggesting he had the latter juror's race in mind when he made his challenge. According to defendants, the exclusion of even one prospective juror for impermissible race-motivated reasons is structural error requiring reversal.

As a threshold matter, defendants' counsel did not raise any issue of comparative analysis in the trial court, and thus the People were not given an opportunity to explain perceived differences between seated jurors and prospective juror No. 12. (Accord, *People v. Bryant* (2019) 40 Cal.App.5th 525, 542, citing *People v. Lenix* (2008) 44 Cal.4th 602, 623; *People v. Winbush* (2017) 2 Cal.5th 402, 442 [" ' "a formulaic comparison of isolated responses [is] an exceptionally poor medium to overturn a trial court's factual finding" ' " concerning the subjective reasonableness of a prosecutor's proffered reasons for excusing a juror].) "As our Supreme Court explained in *Lenix*, 'comparative juror analysis on a cold appellate record has inherent limitations. [Citation.] . . . On appellate review, a voir dire answer sits on a page of transcript. In the trial court, however, advocates and trial judges watch and listen as the answer is delivered. Myriad subtle nuances may shape it, including attitude, attention, interest, body language, facial expression and eye contact.' [Citation.] While we may consider comparative juror analysis for the first time on appeal, the record must be adequate to allow such comparison." (*Bryant*, at p. 542; see also *People v. Armstrong*, *supra*, 6 Cal.5th at p. 780.)

Here, we cannot say the record is adequate to permit the necessary comparison. Proceeding to that analysis in any event based on the portions of the record highlighted by defendants on appeal, we are compelled to uphold the trial court's ruling. "As our

32

high court has explained, for a comparative analysis to be probative, a seated juror must have a ' "substantially similar *combination* of responses," in all material respects' to an excused juror. [Citation.] 'Although jurors need not be completely identical for a comparison to be probative [citation], "they must be materially similar in the respects significant to the prosecutor's stated basis for the challenge." ' " (*People v. Bryant*, *supra*, 40 Cal.App.5th at p. 540, quoting *People v. Winbush*, *supra*, 2 Cal.5th at p. 443.)

We see no such material similarity in the responses of prospective juror No. 1 and prospective juror No. 12. In response to questioning, prospective juror No. 1 stated she would try to come with an open mind and listen to all the evidence, and agreed her job was to deliberate with the other jurors. She agreed she was comfortable with the idea of talking to and learning from the other jurors but reaching her own decision. Prospective juror No. 1 then indicated she had never before served on a jury. Defense counsel asked if she wanted to serve in this case, and she responded: "I guess it would be—I guess. Not—to be honest, not really." When asked why, she said, "I don't know. I just I don't know. I just don't really want to be here." Acknowledging she could not leave unless she was excused, she stated she would "[n]ot serve" because of "[t]he job itself" if given a choice, stating, "I just don't know if I would be able to—I don't know. I just don't know if I would be able to just sit here, and have to listen to everything, and just I don't know. These are people's lives that I don't know if I'm—I'm not sure if I would make the right decision." When asked whether if forced to be on the jury she would be the kind of juror defense counsel would want, she said, "No."

33

This by no means reflects a " 'substantially similar *combination* of responses,' in all material respects, to [prospective juror No. 12]." (*People v. Winbush*, *supra*, 2 Cal.5th at p. 442.) Prospective juror No. 12 expressed reticence in serving as a juror only because of a prepaid, important work-related conference she wished to attend, not because she felt incompetent to make a proper decision in the case. Her responses and attitude were entirely unlike those of prospective juror No. 1.

Here, the trial court considered and evaluated the genuineness and neutrality of the prosecutor's stated reasons for excusing prospective juror No. 12, taking him at his word and finding his peremptory challenge was supported by a permissible motive. Its credibility determination is amply supported by prospective juror No. 12's repeated focus on her desire to attend her work-related event. Applying the appropriate deferential standard of review, we conclude substantial evidence supports the trial court's assessment of the prosecutor's stated reasons. (*People v. Smith*, *supra*, 4 Cal.5th at p. 1147.)

V. *Reconsideration Under Senate Bill No. 1393*

Both Henderson and Marks were sentenced in January 2018. Effective January 1, 2019, while their appeals were pending, the Legislature enacted Senate Bill No. 1393, which amended sections 667, subdivision (a)(1) and 1385, subdivision (b) to give trial courts discretion to dismiss, in the interest of justice, five-year prior serious felony enhancements. (*People v. Jimenez* (2019) 32 Cal.App.5th 409, 426; *People v. Garcia* (2018) 28 Cal.App.5th 961, 971.) Under the versions of those statutes applicable when the court sentenced the defendants, the court had no such discretion, but instead was required to impose an additional five-year consecutive term for " 'any person convicted of

34

a serious felony who previously had been convicted of a serious felony.' " (*Garcia*, at p. 971; see *People v. Franks* (2019) 35 Cal.App.5th 883, 892.)

"[I]t is appropriate to infer, as a matter of statutory construction, that the Legislature intended [Senate Bill No.] 1393 to apply to all cases to which it could constitutionally be applied, that is, to all cases not yet final when [Senate Bill No.] 1393 becomes effective on January 1, 2019." (*People v. Garcia*, *supra*, 28 Cal.App.5th at p. 973.)  The People concede Senate Bill No. 1393 applies retroactively to both Henderson's and Marks's nonfinal cases.  " '[W]hen the record shows that the trial court proceeded with sentencing on the . . . assumption it lacked discretion, remand is necessary so that the trial court may have the opportunity to exercise its sentencing discretion at a new sentencing hearing.' " (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425.)  Remand is not required, however, if "the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken [the previously mandatory] enhancement." (*Ibid.*; *People v. Franks*, *supra*, 35 Cal.App.5th at p. 892; *People v. McVey* (2018) 24 Cal.App.5th 405, 419.)

The People concede that the trial court here gave no such indication.  (Compare, *People v. Franks*, *supra*, 35 Cal.App.5th at p. 893 [record affirmatively showed trial court would not exercise its discretion to strike prior serious felony enhancement when it said, " 'I will not exercise my discretion, which I might have, to strike the punishment of either the strike prior or the 667(a) five-year prior that is to be imposed in this case' "].)  We agree with the People's concession, and conclude remand is appropriate to permit the trial court to exercise its discretion whether to strike the prior serious felony

35

enhancements.  We express no opinion on how the trial court should exercise its discretion on remand.  (See *People v. Jimenez*, *supra*, 32 Cal.App.5th at p. 426.)

DISPOSITION

The sentences of Hernandez and Marks are vacated and the matters remanded with directions that the trial court resentence both defendants and in doing so determine (1) whether to impose a consecutive or concurrent sentence for Hernandez's count 2 conviction; and (2) whether to strike Hernandez's and Marks's five-year enhancement under Penal Code sections 667, subdivision (a)(1) and 1385.  In all other respects the judgments are affirmed.

O'ROURKE, J.

WE CONCUR:


BENKE, Acting P. J.


IRION, J.